[Civ. No. 14925.   First Dist., Div. One.   May 28, 1952.]

GEORGE WASHINGTON, Plaintiff and Appellant, v. CITY AND COUNTY OF SAN FRANCISCO, Respondent; MELVIN E. GARNER, Defendant and Appellant.

Keith, Creede & Sedgwick for Plaintiff and Appellant.

Dion R. Holm, City Attorney, and Thomas M. O'Connor, Deputy City Attorney, for Respondent.

WOOD (Fred B.), J.—Plaintiff has appealed from a judgment entered in favor of defendant city and county of San Francisco, notwithstanding an $85,000 verdict for the plaintiff, in an action for personal injuries resulting from the collision of a city and county police car with a car owned by defendant Melvin E. Garner. Garner appealed from the judgment entered against him, but his appeal has been dismissed at his request.

The police car, an emergency vehicle, was proceeding north on Divisadero Street (a north-south street) in response to an emergency call. The Garner car was proceeding east on Bush Street (an intersecting east-west street). The police car hit the Garner car at the intersection of Divisadero and Bush, propelling the Garner car onto plaintiff who was standing on the sidewalk at the northeast corner of the intersection.

The issues all bear upon the question whether or not the police car was being operated in such a manner as to accord its driver the emergency vehicle privileges mentioned in section 454 of the Vehicle Code and to impose upon other users of the highway the duties defined in section 554 of that code. Unless the police car was being so operated, it is clear that there was evidence for the jury on the issue of the negligence of the driver of the police car; e.g., the police car was traveling at 35 to 60 miles an hour and entered the intersection against a "stop" traffic control signal.

Appellant does not question the facts that the police car was an emergency vehicle, that the driver of the police car was responding to an emergency call, and that the police car displayed the required red lamp.

He does claim there was evidence from which the jury could infer that the siren was not sounded, or that it was sounded in an improper and deficient manner.

*As to the sounding of the siren,* the statute* declared the driver of such a car exempt from the provisions of (not required to observe the regulations contained in) chapter 3 (§§ 465-478) and chapters 6-13 inclusive (§§ 510-592.2) of division 9 of the Vehicle Code, whenever the vehicle was being driven in response to an emergency call, and that "said exemption shall apply only when the driver of said vehicle *sounds a siren as may be reasonably necessary* and the vehicle displays a lighted red lamp visible from the front as a warning to others." (Veh. Code, § 454, emphasis added.) It further provided that "said exemptions shall not relieve the driver of any said vehicle from the duty to drive with due regard for the safety of all persons using the highway [a duty which is discharged if the required red light is displayed and if the driver sounds the siren 'as may be reasonably necessary' (*Reed* v. *Simpson,* 32 Cal.2d 444, 449-451 [196 P.2d 895])], nor shall the provisions of this section protect any such driver from the consequences of an arbitrary exercise of the privileges declared in this section" (the latter, a question with which we are not immediately concerned). With these provisions of section 454, we must read and consider the following provisions of section 554 of the same code: "Upon the immediate approach of an authorized emergency vehicle *giving audible signal by siren* and having at least one lighted lamp exhibiting red light visible under normal atmospheric conditions from a distance of 500 feet to the front of such vehicle: (1) The driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the righthand edge or curb of the highway clear of any intersection and thereupon stop and remain in such position until such authorized emergency vehicle has passed, except when otherwise directed by a police or traffic officer . . ." (Emphasis added.)

The italicized phrases of these two sections must be considered together and reconciled. The phrase "giving audible signal by siren" (§ 554) seems to impose the absolute duty to sound the siren at all events and under all circumstances. But the phrase "sounds a siren as may be reasonably necessary" is the later enactment of these two and requires the

---

*At the time of the accident, which occurred September 18, 1948, section 454 of the Vehicle Code read as amended by the Statutes of 1945, chapter 1251, page 2364; section 554, as amended by the Statutes of 1941, chapter 1057, page 2725.

driver to sound the siren only when, under all the circumstances, it is reasonably necessary to do so as a warning to others. (See *Reed* v. *Simpson, supra,* 32 Cal.2d 444, 448-449, construing the 1937 form of section 454, not materially different, as to this feature, from the 1945 form which we are considering.)

If, in a particular case, the trier of the facts finds, upon sufficient evidence, that it was reasonably necessary for the driver of an emergency vehicle to ''sound a siren'' as well as display the red light (to acquire the exemption or privilege), there conceivably might also be involved the issue, as a question of fact, whether in sounding his siren he gave an ''audible signal'' that was suitable ''as a warning to others'' under all of the circumstances of the case. We find a suggestion to this effect in *Goldstein* v. *Rogers,* 93 Cal. App.2d 201 [208 P.2d 719]. The court reversed a judgment for the defendant because the trial court, by its instructions, advised the jury, in effect, that unless the plaintiffs (operators of an emergency vehicle) sounded their siren (regardless of the need or lack of need for signaling by sound) they did not acquire and enjoy the privileges accorded by section 454. In discussing that question the court made the following observations: ''Under the facts of the present case plaintiffs could not have been found guilty of contributory negligence unless the jury determined from the evidence that they had failed to *sound a siren in a manner that would have afforded others a reasonable opportunity to yield the right of way,* or that they had maintained a speed which under the circumstances constituted an arbitrary exercise of their right-of-way privilege. *If the siren was sounded in a manner which afforded others a reasonable opportunity to yield the right of way* plaintiffs were not to be held negligent because of their speed alone, nor their failure to drive on the right hand half of the highway, or to stop at the intersection because the traffic signal was against them.'' (93 Cal.App.2d at p. 207, emphasis added.)

We conclude that sections 454 and 554, read together, mean that (to enjoy exemption from the speed and traffic law requirements) the driver of an emergency vehicle (in addition to displaying the red light) must give audible signal ·by siren, as a warning to others using the highway, when under all the circumstances it is reasonably necessary to do so, and in such a case he must sound the siren in such a manner, with such audibility, as will afford the others a reason-

able opportunity to yield the right of way. "Others," of course, means persons of reasonably good hearing who are giving attention to their surroundings in observance of their duties as users of the public highways.

This requirement presents in each case these questions of fact: (1) Was it reasonably necessary, under all the circumstances, to give audible signal by siren, as a warning to others? (2) If so, did this driver give signal by siren? (3) If so, did he give audible signal by siren? The jury impliedly found in the affirmative on the first question and in the negative on the second question or the third.

No one claims that the affirmative answer to the first question was without support in the evidence. The police car red light alone conceivably might have been sufficient warning to a vehicle driver approaching the police car on Divisadero Street. But Garner was traveling toward Divisadero on Bush, a cross street. The police car red light could not possibly be visible to Garner until both cars were dangerously close to the intersection.

As to the police car siren, the only reasonable inference to be drawn from the evidence is that it was sounded, as a review of the evidence will indicate.

Whether or not the driver of the police car, in sounding his siren, gave "audible signal" by siren, within the meaning of the statute, is a serious question. Can a court say that a reasonable man can draw but one inference from the evidence, the inference that the driver gave such a signal? Or, is more than one inference legally possible, one of them to the effect that he did not give such a signal? If the latter, it was the function of the jury to select the inference, not for the court to withdraw that determination of fact from the jury by granting the motion for judgment notwithstanding the verdict. We will now consider the evidence on that issue.

John Jordan, police officer riding in the front seat of the police car testified: When we received the emergency call we started down Haight Street to Masonic, thence to Geary, down Geary to Divisadero, and north on Divisadero toward Sacramento (north of Bush); as soon as we got the call, officer Schultz, driver of the police car, put on the red light, and I, the traffic was so heavy, pulled out the siren. As we went along Divisadero I was holding the siren all the way out because of all the traffic. It was a loud shriek; it was all the way out. If you pull the siren out just so far

(this was a manually controlled siren, under the hood of the car) you can control the sound and pitch, by pulling the handle all the way out it has a high shriek. It makes the highest sound when the handle is completely out. When you pull the siren out it does not increase the sound. It merely increases the pitch, makes a higher pitch. When for four blocks (there are two streets, Post and Sutter, between Geary and Bush) you have the handle out it reaches the highest note it can reach. That high note is a thin, shrill, high scream effect. As we came down Divisadero there was none of this sound effect when the siren dies down, roars up and dies down and roars up again. Asked if a dog can hear a higher frequency than can a human being, the witness said: Yes, the sound is soft to us but a dog can hear it blocks away, nearly a mile away, due to the high frequency of it. To us it is very low because our ear is not sensitive to the higher frequency. The human ear does not hear high frequency or high pitch as well as the ''lower ones.'' Milton Hansen, a police officer riding in the rear seat of the police car, testified that the siren and the light were on at all times.

George C. Brown testified: I was driving my car south on Divisadero; as I approached Bush I saw the police car when it was 1½ to 2 blocks (400 feet and more) away from me. I stopped at the intersection, in the right center lane. I heard the siren before that and by the siren identified it as a police car, also by the revolving light. The siren was a rather shrill sound the time I [first?] heard it, a rather high pitched sound. As it got closer, it naturally seemed to sound louder. It was a high pitched, shrill, loud sound. As it came to Bush Street it was a very high pitch. It was continuously sounding at a high pitch. I had my driver's window open. Mrs. Jean Wilson, riding in the rear seat of Brown's car, said she heard the police car before she ''noticed'' that car. The Brown car was stopped when she first heard it. A little later she looked up and saw the police car. It was between Sutter and Post then, closer to Sutter.

Vernon Johnson, driving his car south on Divisadero toward Bush, testified: I was half way between Pine and Bush (Pine runs parallel to Bush and lies next to Bush, to the north of the latter) when I saw the police car. I then stopped at the northwest corner of Divisadero and Bush, by the curb. When I first saw the police car it was between Geary and Post, closer to Post (500 feet and more away). I saw the twirling red light on the police car and heard

the siren. As it approached Bush it was a very high pitch. I knew it was a police car from the siren. The siren was just a high pitched shrill, a high frequency thing.

Robert L. Stone was upstairs in a garage on Divisadero between Bush and Sutter, closer to Bush. He said: The siren first attracted my attention to the police car. It was just a very high pitched scream that was constant. I was standing near an open window and looked out then. The police car was on Divisadero approaching Sutter, closer to Sutter than Post (200 feet or more away from him). The siren was going continuously. It was just a continuous, single pitch. "Let me say it was inaudible and not very clear at all, very similar to a dog whistle." It was high, a very high, shrill, single note. It was not an exceptionally loud siren. The reason I looked out the window was because I heard the siren. At that time the police car was not two blocks away.

Henry Roberts was in a shoeshop, on Divisadero, a couple of doors from Sutter Street. He testified: I was inside and heard the siren blowing. I ran out to the edge of the sidewalk, saw the police officer and saw him going up to Bush until they had the accident. When I saw the police car it was one-half block from Geary, coming toward Bush (about 400 feet from him). The siren was wide open; anyways it was pretty loud.

Defendant Melvin E. Garner testified: I did not hear the siren at any time before the accident, nor see the police car, nor see any red light. My hearing is excellent. My wife's hearing is excellent. Her mother's hearing is excellent. They were riding with me in my car. Fred Fegan, who talked with Garner shortly after the accident, testified: Garner said he did not hear the police car; Garner thought he was talking to his wife at the time and eating corn chips; he said the first time he knew of the impending accident was when he felt the impact. On the witness stand, Garner said: It is possible that I was eating some corn chips; I do not remember for sure. As we drove along I perhaps was talking to my wife and her mother. I am not sure now if I was talking to my wife at the time of the accident. As I approached Divisadero Street I looked in both directions before I got to the intersection; I think to the left first and then to the right, but am not sure in which order. When I looked to the right I was about 30 feet from the west curb line of Divisadero and looked to the south on Divisadero about 60 to 70 feet; I did not see

any car, within my view, traveling north on Divisadero; I then looked just straight ahead. I did not apply my brakes. I can't tell you much about the collision. I think I recall hearing the pop or crack. I was rendered unconscious. When I came to, I was behind the steering wheel. My car was struck on the right side at the fire wall, right behind the front wheel where the dashboard is. I believe the left front fender of the police car hit my car. The traffic signal for west to east traffic on Bush Street (Bush was a one-way street for eastbound traffic) as I approached Divisadero was on "Go." I noticed it change to that when I was back about 150 feet, possibly more, may be a little less, from Divisadero. Mrs. Garner testified: I was riding in the front seat in my husband's car, looking out the right window, was looking to the right all the time up to the time of the accident; I looked to the south on Divisadero possibly three or four car lengths and saw no car approaching. I did not hear any siren, nor did I see any red light. I did not hear the screaming of brakes. On Bush Street, before coming to Divisadero, I did not hear a thing unusual. After we got into the intersection the only thought I had was that I was taking gas and slipping into unconsciousness. Prior to then I heard nothing. Mrs. Sadie Abraham, mother of Mrs. Garner, was riding in the rear seat of the Garner car. She testified: I do not recall entering the intersection. I did not see the police car, nor hear any siren, nor see the red light. The first I knew of the impact was I heard a crash and the next thing I knew they were taking me out of the car. I just felt the crash and I was "out." In the space of ten minutes prior to the impact I did not hear a siren of any nature, nor unusual sounds of any nature. I did not hear the application of brakes.

William T. Duggan, a physician and surgeon (an ear, nose and throat specialist), was called as an expert witness. He testified: A high frequency tone is constant. Intermittent sounds are much more easily heard than steady tones. A sound is much more apt to be heard by the human ear if it is changed than if it is steady. The human ear should be able to hear a sound that is kept on a high pitch. However, if intermittent, it would be more apt to be heard. A whistle for calling a dog is a very low sound object. It is difficult to hear because [it has] a very high pitch, a very high frequency. Some animals whose ears are receptive to high pitches can hear them for great distances. As to the siren on the average

police car, it starts at the lower frequency and winds up as the siren is turned up and the revolutions increase, the vibrations increase. The more you pull it out and the longer and faster it goes, the higher the pitch gets. Pitch and frequency can be described as being similar, synonymous. If for four, five, or six blocks a police siren is held at this highest pitch without letting it off at all, until it gets to the top or highest frequency, the high pitch it finally gets up to is a wail almost, a thin scream. By letting it off and on they increase the audibility of the siren because the tone of the high pitch is harder to hear. The longer you hold out the siren at the higher pitch the less is the audibility of it. I do not believe you can get the frequency so high you cannot hear it at all. You can, I suppose, but I think these instruments are made for that particular purpose and would hold it within human range. You can take a siren that has enough power behind it and the human ear cannot hear it at all. It gets up there and finally diminishes and you do not realize there is a noise there. We are talking of the police siren under the hood, not of the big ones on fire engines and ambulances. I do not know the type of siren involved in this. Not knowing what type this siren is, I have not made a test.

▊ Here is substantial evidence that the siren's sound was constant and that such a sound is harder to hear than if intermittent; that the siren was maintained at its highest pitch and if for such a period as here involved a police siren is so maintained it gets up to a wail, a thin scream, a tone that is harder to hear than if the pitch were varied; that with enough power behind a siren it gets up there and diminishes until you do not realize there is a noise there. One witness said this siren had a high-pitched, a shrill sound, a very high pitch; another that it was a very high pitch, just a high-pitched shrill, a high frequency thing; another, that it was a constant high-pitched scream, not very clear at all, similar to a dog whistle, a very high shrill single note, not exceptionally loud. Three persons most in need of a suitable sound signal as a warning (they were approaching on a side street and could not see the police car's red light until they neared the intersection, possibly too late to draw to the curb and avoid the hazard) testified they did not hear the siren. Two of these three said they did not hear any unusual sounds. And the operator of the siren said the traffic was heavy (traffic which, inferentially, may have furnished interfering sounds and noises).

This evidence and the inferences which reasonably may be drawn from it support an implied finding of the jury that the driver of the police car, though he sounded his siren, did not give such audible signal as was suitable, under all of the circumstances of the case, as a warning to others using the highway, particularly to persons traveling on a cross street toward this intersection. A reviewing court cannot say as a matter of law that the requisite audible signal by siren was given. Nor could the trial judge do so when ruling upon a motion for judgment notwithstanding the verdict. His function in passing upon such a motion is quite different from that which he performs when considering and deciding a motion for a new trial. ■ A motion for judgment notwithstanding the verdict may not properly be granted unless there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff, giving to the evidence in favor of plaintiff all the value to which it is legally entitled and indulging in every legitimate inference which may be drawn from that evidence. ■ In contrast, the granting or refusal of a new trial rests largely in the discretion of the trial judge, whose province and duty it is to scrutinize and weigh the evidence. (See *Estate of Lekos,* 109 Cal. App.2d 42, at 44 and 47 [240 P.2d 387], approving an order which denied a motion for judgment notwithstanding the verdict and affirming an order which granted a new trial; and *Devens* v. *Goldberg,* 96 Cal.App.2d 539 [215 P.2d 935], affirming an order which granted a new trial, after reversal of a judgment entered notwithstanding the verdict.)

In view of the conclusion which we have reached, it is not necessary to consider other points presented by the plaintiff in support of his appeal.

The judgment in favor of the city and county of San Francisco is reversed, and the trial court is directed to enter judgment for plaintiff and against the city and county in accordance with the verdict.

Peters, P. J., and Bray, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 24, 1952.